UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| CALEB SALMON, ) | |
| ) | |
| Plaintiff, ) | |
| v. ) | Case No. 14-CV-0265-CVE-TLW |
| ) | |
| CRST EXPEDITED, INC, et al., ) | |
| ) | |
| Defendants. ) | |

### PLAINTIFF'S RESPONSE TO NUTRA PHARMA CORP'S
### MOTION FOR SANCTIONS

COMES NOW the Plaintiff, Caleb Salmon, *pro se*, and submits his Response to Nutra Pharma Corporation's Motion for Sanctions. Doc. No. 86. In response, Plaintiff would respectfully show the Court as follows:

# INTRODUCTION

Although Nutra Pharma Corporation fails to cite or apply the standard for sanctions, or to clearly identify exactly what conduct violates the standard, it appears that Nutra Pharma Corp ("NPC") asserts that Plaintiff has sued the wrong company and has pled "scandalous and spurious" allegations. However, Plaintiff carefully selected NPC as a defendant after many hours of investigation, and legal precedent supports his claims. Plaintiff was highly conservative and charitable in his characterization of NPC activities, given the likely truth. Finally, NPC has misrepresented the existence of MyNyloxin.com. NPC claims that MyNyloxin.com was an independent contractor performing marketing activities; however **it was not created as a separate entity after it made most of the robo-calls to Plaintiff.** It was created **after** this litigation commenced in an attempt to shield NPC from liability, in the hope that neither Plaintiff nor this Court would discover when it was actually created.

## STATEMENT OF INVESTIGATIVE FACTS

1. Plaintiff filed suit against telemarketers calling from 321-332-1516 on December 12, 2013, 256-970-2626 on February 19, 2014, and 314-669-2629 on March 26, 2014, which left very similar messages inviting Plaintiff to join "Johnny Cash" if he wanted "more money in his life" and referred him to the websites "totalcashcontrol.com" and "yourtotalcashcontrol.com." Plaintiff received a call later from October 8, 2014 from 203-295-2626 using the same phraseology. Doc. 49, ¶¶36-52.

2. Plaintiff has spent over 200 hours researching, and briefing the Telephone Consumer Protection Act of 1991, its regulations, and FCC opinions. *Exhibit 1*.

3. After discovering that Steve Gewecke was responsible for making some of the calls to his cell phone, he spent over 6 hours reviewing materials produced by Nutra Pharma Corp, MyNyloxin, and their distributors prior to filing his First Amended Complaint. Doc. 49. This included documents, filings, videos, press releases and investor reports. *Exhibit 1*.

4. NPC sells a pain reliever made out of cobra poison. Rather than sell this product through traditional channels such as Walgreens, CVS or Wal-mart, NPC sells it through a multi-level marketing system, where purchasers and users ("distributors") may in turn sell it to other people and make commissions from selling it. The more subscribers a distributor has below them, the more money they can make. In September of 2012, Nutra Pharma Corp began using TCN International, a.k.a. the "Text Cash Network" to "aggressively market and sell Nyloxin" to 40,000 distributors. *Exhibit 2, 3, 4, 5*.

5. "Text Cash Network" morphed into "True Cash Network" in August of 2013 after it began to market Nyloxin. *Exhibit 6*.

6. After Text Cash Network and True Cash Network were accused on the Internet for having previously run pyramid schemes, the group dropped the use of those names and referred to themselves as "MyNyloxin.com." [1] *Exhibit 3, 7, 8.*

7. After obtaining permission from this Court, Plaintiff issued subpoenas to several layers of telecommunications contractors and subcontractors until he discovered the end users of the first three phone numbers.

8. The end user of 321-332-1516 sent on December 12, 2013 was Defendant Alan Turnquist. *Exhibit 9.*

9. The end user of 314-669-2629 sent on February 19 was Defendant Darrick Patterson. *Exhibit 10.*

10. The end user of 256-970-2626 sent on March 26 was Reba King. *Exhibit 11.*

11. The owner of the "totalcashcontrol.com" and "yourtotalcashcontrol.com" sites referred to in two of the voicemails from those numbers was Steve Gewecke. *Exhibit 12.*

12. On April 3, 2014, Nutra Pharm Corp announced a telemarketing campaign through the "MyNyloxin Telemarketing Division" aimed at making over "70,000 outbound phone calls" **per day** to potential MyNyloxin distributors and customers.[2] *Exhibit 13.*

---

[1] Whether they actually operated pyramid schemes prior to marketing MyNyloxin is unknown at this time. Plaintiff does not believe that NPC directly operated a pyramid scheme. However, failure to obtain retail outlets for its product likely made it desperate to move product and forced it into partnership with unscrupulous marketers who disregarded both the TCPA and SEC regulations. As argued herein, there is ample evidence that NPC knew or became aware of the violations, yet accepted the benefits and failed to question the methods used. A brief Internet search of the names involved would have placed NPC on notice of TCN's prior activities.

[2] NPC admits here that the people it was trying to reach with the telemarketing campaign were not current customers or distributors but essentially "cold calls."

13. On April 29, 2014, Steve Gewecke was appointed president of MyNyloxin by Rik Deitsch, the CEO of NPC, and NPC's Board of Trustees. *Exhibit 14*.

14. Plaintiff received the October 8, 2014 voicemail inviting him to visit totalcashcontrol.com, a website owned by Steve Gewecke, **after** Gewecke had been appointed as president of NPC. Doc. 49, ¶45.

15. Text Cash Network, Inc. is a dissolved Wyoming corporation as of January 10, 2013. *Exhibit 15*.

16. To Plaintiff's best investigative knowledge, True Cash Network does not exist as an independent corporate entity. *Exhibit 1*.

17. MyNyloxin.com, Inc. was created on September 4, 2014, **after** Steve Gewecke became president of it, **after** NPC began its telemarketing campaign, and **after** three of the phone calls to Plaintiff. *Exhibit 16*.

18. MyNyloxin.com uses Nyloxin®, a registered trademark of NPC. *Exhibit 17*.

19. Steve Gewecke announced that MyNyloxin was using its Direct Response Media Division to sell "media units." *Exhibit 18*.

20. A "media unit" is an amount of money paid by a distributor that is aggregated together with investments from other distributors to purchase television advertising for MyNyloxin. A distributor receives a return on the "media unit" from distributors below who purchase media units, and also from a share of the product sold by the television advertisement purchased. *Exhibit 19*.

21. To Plaintiff's best investigative knowledge, MyNyloxin's "media units" are not registered as securities with the Securities and Exchange Commission. *Exhibit 1*.

**ARGUMENTS AND AUTHORITIES**

Rule 11 requires that "claims...are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law" and that the "factual contention have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed.R.Civ.P 11(b)(2)-(3).  Because Defendant NPC has challenged the basis of Plaintiff's claims, he offers evidence to prove that he has performed substantial investigation that supports his claims.  Plaintiff's claims against Nutra Pharma Corp as a principal liable for the actions of its agents and partners are well-taken and solidly grounded in an FCC ruling and existing district court authority in this Circuit.  It is actually NPC that is without a defense in existing case law.

1. ***A Multi-Level Marketing Seller Can Be Liable for the Actions of Its Distributors Under Classical Agency Principles.***

A multi-level marketing seller ("MLM seller") is liable for the wrongful acts of its distributors under standard agency principles when the MLM seller has reason to know of its acts.  *See Pontrelli v. Monavie, Inc.,* 2014 U.S. Dist. LEXIS 114718, 4 (D.N.J. Aug. 19, 2014). Monavie, the MLM seller in *Pontrelli*, clearly forbade its distributors from making false claims about the curative properties of the product, yet knew of fantastical claims being made about the juice's curative properties and still accepted the financial benefits of the misrepresentations.  *Id.* at *8.  Because the distributors used Monavie's trademark with permission and "provided clear policies and procedures for the Distributors to follow" the distributors were held to be agents of Monavie, and Monavie was vicariously liable for their actions.  *Id.* at *10-12.

Exactly like the distributors in *Pontrelli*, NPC's distributors engaged in wrongful conduct by autodialing Plaintiff's cell phone and leaving prerecorded messages in violation of the TCPA.

NPC knew of the violation because its president authorized a telemarketing campaign **70,000 phone calls per day.** Unless NPC employed hundreds of telemarketers, it is unlikely it could make that many dials manually. Like Monavie, NPC has authorized its MyNyloxin.com distributors to use its trademark. *Exhibit 17*. Like Monavie, NPC was well aware of the telemarketing campaign and accepted the benefits of it. NPC can be held liable on standard agency principles under the reasoning of *Pontrelli*. Plaintiff has more than met his duty to allege facts that "likely have evidentiary support after a reasonable opportunity for further investigation or discovery." Fed.R.Civ.P 11(b)(3).

2. *A Multi-Level Marketing Seller Can Be Liable for TCPA Violations of Its Distributors Under Ratification Agency Principles.*

Agency principles **broaden** under the Telephone Consumer Protection Act of 1991 ("TCPA"). 47 U.S.C. § 227 *et seq.* A principal may be held liable for the telemarketing actions of its agent acting with classical authority, apparent authority, or by ratification. *In the Matter of the Joint Petition Filed by Dish Network, LLC*, 28 F.C.C.R. 6574, 6584 (F.C.C. May 9, 2013) (Review dismissed by D.C. Circuit).

> A seller may be liable for the acts of another under traditional agency principles if it ratifies those acts by **knowingly accepting their benefits**. Such ratification may occur "through conduct **justifiable only on the assumption that the person consents to be bound** by the act's legal consequences."

*Id.* at 6587(emphasis added). The District Court of Colorado immediately applied this "long-awaited ruling" to rule that Dish Network LLC could be held liable "by ratification (such as when the principal knowingly accepts the benefits of the actor's conduct)." *Donaca v. Dish Network, LLC*, 303 F.R.D. 390, 394 (D. Colo. 2014).

> [C]onsistent with the statute's consumer protection goals, potential seller liability will give the seller **appropriate incentives to ensure that their telemarketers comply with our rules**. By contrast, allowing the seller to avoid potential liability

> by outsourcing its telemarketing activities to unsupervised third parties would leave consumers in many cases without an effective remedy for telemarketing intrusions.

*Donaca v. Dish Network, LLC*, 303 F.R.D. 390, 394 (D. Colo. 2014) (quoting 28 F.C.C.R. 6574, 6588).  Under the ruling of the FCC and *Donaca*, Plaintiff's investigation indicates that NPC is likely liable to Plaintiff under ratification principles as well *Pontrelli's* classical agency principles applied specifically to multi-level marketing companies.

   3. ***Plaintiff's Allegation that NPC Offered Unregistered Securities Through MyNyloxin.com has Reasonable Basis in Fact.***

NPC and MyNyloxin's Direct Response Media Division is troubling.  It is relevant to a claim under the TCPA because liability for an unsolicited advertisement under 47 C.F.R. 64.1200(a)(2) may be established if the seller or telemarketer encourages "investment in...property, goods, or services." 47 C.F.R. 64.1200(f)(9)-(12) Here, Plaintiff asserts that NPC, through MyNyloxin, intended to encourage him to invest in these "media units."  Perhaps that was how they intended to help him get "more money in his life today."

The definition of security in the Securities Act of 1933 is a well-trodden path.  The term "security"

> embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits.

*SEC v. W. J. Howey Co.*, 328 U.S. 293, 299 (U.S. 1946).  "Investors provide the capital and share in the earnings and profits; the promoters manage, control and operate the enterprise." *Id.* at 300.  These "media units" were not registered under Regulation A or Regulation D under any name affiliated with NPC or MyNyloxin.com, which is a requirement under the Securities Act of 1933.  Plaintiff's allegation that NPC engaged in the sale of unregistered securities in violation of

SEC regulations was well-founded because (1) NPC and MyNyloxin's media units are securities (2) which are unregistered, (3) in violation of the SEC's filing requirements and (4) support Plaintiff's allegations that NPC is engaged in telemarketing through MyNyloxin.com.

4. *NPC Misrepresented MyNyolxin.com's Existence.*

NPC represented that MyNyloxin.com was "simply a distributor of NPC's products with its own separate corporate existence. If not an outright lie, it conveniently avoided the fact that it did not have any corporate existence at the time most of the phone calls were made to Plaintiff, and at the time Steve Gewecke was appointed as president of MyNyloxin **by the CEO of NPC and NPC's Board of Directors.** MyNyloxin.com was not created until **after** NPC realized it had liability under the TCPA in what will be a failed attempt to create a distinction after the fact.

"[A] frivolous motion for sanctions is, in itself, sanctionable." *Bond v. American Medical Ass'n*, 764 F. Supp. 122, 126 n.3 (N.D. Ill. 1991). Plaintiff will refrain from asking this Court to sanction NPC on this occasion. However, he has more than carried his burden to show that his allegations have substantial factual support, and NPC's *Motion for Sanctions* should be denied.

**WHEREFORE,** premises considered, Plaintiff prays this Court DENY Defendant NPC's motion, and all other relief deemed just and proper.

>Respectfully submitted,
>**Caleb Salmon**
>
>/s/Caleb Salmon
>Caleb M. Salmon
>8801 S. Yale, Suite 420
>Tulsa, OK  74137
>Telephone:    319-230-6334
>salmonlegis@gmail.com

**CERTIFICATE OF SERVICE**

   I hereby certify that on the 25th day of March, 2015, I electronically transmitted a true and correct copy of the above pleading and exhibits by email to the following ECF registrants which have entered an appearance in this case:

Stuart D. Campbell - scampbell@dsda.com
Matthew Christensen - mchristensen@dsda.com
Daniel Herrod – dherrod@dsda.com
Daniel DeSouza – ddesouza@desouzalaw.com
Thomas Martin Askew – taskew@riggsabney.com, bboyd@riggsabney.com, jeanne_moyer@riggsabney.com

                  /s/ Caleb Salmon