UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| CALEB SALMON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 14-CV-0265-CVE-TLW |
| | ) | |
| CRST EXPEDITED, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## OPINION AND ORDER

Now before the Court are the following motions: Defendant Nutra Pharma Corp.'s Motion for Sanctions Pursuant to Federal Rule Civil Procedure 11 (Dkt. # 86); Defendant Nutra Pharma Corp.'s Motion to Dismiss and Brief in Support (Dkt. # 91); and Plaintiff's Motion to Reconsider Summary Judgment (Dkt. # 107). Defendant Nutra Pharma Corp. (NPC) asks the Court to dismiss plaintiff's claims with prejudice and to award NPC attorney fees for having to defend against plaintiff's frivolous claims. Plaintiff Caleb Salmon responds that he has properly alleged claims against NPC under a theory that agents of NPC made unwanted telephone solicitations to plaintiff's cell phone, and he argues that his claims against NPC are not frivolous. Plaintiff also asks the Court to reconsider its opinion and order (Dkt. # 100) granting defendant CRST Expedited, Inc.'s (CRST) motion for summary judgment. Dkt. # 107.

### I.

On May 23, 2014, Caleb Salmon filed this case alleging that his cell phone number has been on the National Do Not Call Registry since 2008, but he claims that he received unwanted solicitations on his cell phone from persons or entities with whom or which he has no personal or business relationship. Dkt. # 2, at 4. Salmon alleges that he received two calls from CRST

Expedited, Inc. (CRST) informing him of possible employment opportunities as a truck driver Many of the defendants in the complaint were identified as "John Doe telemarketers" or "John Doe Teletexters," and they are identified by the phone numbers from which plaintiff allegedly received calls on his cell phone. Salmon alleged claims under the Telephone Consumer Protection Act, 47 U.S.C. § 227 et seq. (TCPA), and the Oklahoma Consumer Protection Act, OKLA. STAT. tit. 15, § 752 et seq. (OCPA). He also alleged state law claims of invasion of privacy by intrusion upon seclusion, aggravation and loss of time, and negligent hiring or supervision. NPC was not named as a party in the original complaint. Salmon was a law student when the case was filed and he is not represented by an attorney.[1]

CRST filed a motion for summary judgment (Dkt. # 42) on the grounds that calls concerning employment opportunities were not prohibited "telemarketing" under the TCPA and that plaintiff consented to receive calls from CRST. Plaintiff argued that the employment opportunity offered by CRST was a scam and that he did not consent to receive calls from CRST. He also stated that the "dispositive issue is whether CRST's calls included an advertisement or constituted telemarketing under 47 C.F.R. § 64.1200(a)(2). Dkt. # 43, at 12. The Court granted CRST's motion for summary judgment and found that the calls received by plaintiff did not constitute telemarketing under the TCPA. Dkt. # 100, at 10. The Court also granted summary judgment to CRST on plaintiff's state law claims. Id. at 11-16.

---

[1] The parties have not provided any additional information on plaintiff's status, and it is not clear if he is still a law student or if he is now a licensed attorney. In any event, plaintiff was a law student when the pleadings at issue were signed by plaintiff, and he should have been familiar with the requirements of Fed. R. Civ. P. 11.

Salmon filed a motion requesting leave to dismiss defendants Johns Does 2, 7, 11, 12, 13, 14, and 16 and to substitute, inter alia, Steve Gewecke, Morningstar Marketing and Consulting, LLC (Morningstar), MyNyloxin Group (MyNyloxin), and NPC as defendants. Dkt. # 41. Salmon claimed that he identified Gewecke as the owner of certain websites mentioned in messages on his cell phone, and he further alleged that Gewecke is the president of MyNyloxin. He alleges that MyNyloxin sells products and unregistered securities offered by NPC. The Court granted plaintiff's motion to amend and directed him to serve any new defendants no later than February 9, 2015. Dkt. # 47. Plaintiff filed an amended complaint (Dkt. # 49) alleging that Alan Turnquist, Darick Patterson, Alicia Croker/Turnquist, Gewecke, Morningstar, and MyNyloxin are part of a multi-level marketing scheme (MLM) to distribute NPC's products, and he claims that he received four calls on his cell phone from a member of the MLM.[2] Dkt. # 49, at 6-7. Three of the calls concerned a money making scheme promoted by "Erica and her business partner, Johnny 'Cash,'" and a fourth call concerned a marketing program. Id. None of the calls mentioned NPC or Nyloxin and, instead, plaintiff alleges that the MLM was marketing an unregistered security called a "media unit."

NPC has filed a motion to dismiss (Dkt. # 91) all of plaintiff's claims against it, and NPC also asks the Court to sanction plaintiff under Fed. R. Civ. P. 11 (Dkt. # 86). Plaintiff has filed a motion (Dkt. # 107) asking the Court to reconsider its opinion and order (Dkt. # 100) granting CRST's motion for summary judgment.

---

[2] Plaintiff alleges that NPC produces and distributes a product called "Nyloxin," which he claims is a "topical analgesic made from cobra poison." Dkt. # 49, at 8.

**II.**

NPC argues that plaintiff's amended complaint fails to state a claim under the TCPA or an invasion of privacy claim under Oklahoma law, because there are no allegations that NPC directly made calls to plaintiff or that it directed its agents to contact plaintiff.[3]  Dkt. # 91, at 6.  Even if the Court were to assume that NPC was part of an MLM including MyNyloxin, NPC argues that there are no allegations that MyNyloxin or any other defendant contacted plaintiff for the purpose of selling a product sold by NPC.  Id. at 7.  Plaintiff responds that he has alleged that NPC utilized a MLM organization to sell its products, and he claims that NPC can be held liable for the acts of its agents.  Dkt. # 105, at 4.

**A.**

In considering a motion to dismiss under Rule 12(b)(6), a court must determine whether the claimant has stated a claim upon which relief may be granted.  A motion to dismiss is properly granted when a complaint provides no "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action."  Bell Atlantic Corp. v. Twombly, 550 U.S. 544,  555 (2007).  A complaint must contain enough "facts to state a claim to relief that is plausible on its face"and the factual allegations "must be enough to raise a right to relief above the speculative level."  Id. (citations omitted).  "Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint."  Id. at 562.  Although decided within an antitrust context, Twombly "expounded the pleading standard for all civil actions." Ashcroft v. Iqbal, 556 U.S. 662, 684 (2009).  For the purpose of making the dismissal determination, a court

---

[3]   Plaintiff has voluntarily abandoned his OCPA claim against NPC, and the Court will not discuss that claim in this Opinion and Order.  Dkt. # 105, at 3 n.1.

must accept all the well-pleaded allegations of the complaint as true, even if doubtful in fact, and must construe the allegations in the light most favorable to claimant. Twombly, 550 U.S. at 555; Alvarado v. KOB-TV, LLC, 493 F.3d 1210, 1215 (10th Cir. 2007); Moffett v. Halliburton Energy Servs., Inc., 291 F.3d 1227, 1231 (10th Cir. 2002). However, a court need not accept as true those allegations that are conclusory in nature. Erikson v. Pawnee County Bd. Of County Comm'rs, 263 F.3d 1151, 1154-55 (10th Cir. 2001). "[C]onclusory allegations without supporting factual averments are insufficient to state a claim upon which relief can be based." Hall v. Bellmon, 935 F.2d 1106, 1109-10 (10th Cir. 1991).

**B.**

Plaintiff argues that he has adequately alleged a TCPA claim against NPC, because he asserts that he received four calls made using autodialing equipment and he alleges that the calls can be traced to an MLM operating on behalf of NPC. "Congress found that unrestricted telemarketing can be an intrusive invasion of privacy and that many consumers are outraged by the proliferation of intrusive calls to their homes from telemarketers," and the TCPA was enacted to reduce the number of telephone solicitations received by consumers. FTC v. Mainstream Marketing Servs., Inc., 345 F.3d 850, 857 (10th Cir. 2003). Under the TCPA, it is unlawful "for any person within the United States . . . to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is . . . exempted by rule or order of the [Federal Communications Commission (FCC)] . . . ." 47 U.S.C. § 227(b)(1)(B). The TCPA also prohibits any person from "mak[ing] a call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system . . . to any telephone number assigned to a . . . cellular

5

telephone service . . . ." Id. § (b)(1)(A)(iii). The TCPA creates a private right of action for any person who has received more than one call in a 12 month period from the same entity, but the statute expressly states that the claim shall be brought "in an appropriate court of that State . . . ." Id. § (c)(5). Although the TCPA states that it creates a private right of action in state courts, the Supreme Court has determined that state and federal courts have concurrent jurisdiction over claims arising under the TCPA. Mims v. Arrow Financial Servs., LLC, 132 S. Ct. 740, 747 (2012).

The FCC has the authority to promulgate rules for the enforcement of the TCPA. Id. at 746. Under the FCC's rules, it is illegal to "initiate any telephone call (other than a call made for emergency purposes or is made with the prior express consent of the called party) using an automatic dialing system or an artificial or prerecorded voice . . . ." 47 C.F.R. § 64.1200(a)(1). In addition, no person may "[i]nitiate, or cause to be initiated, any telephone call that includes or introduces an advertisement or constitutes telemarketing, using an automatic dialing system . . . , other than a call made with the prior express written consent of the called party . . . ." Id. § 64.1200(a)(2). "Advertisement means any material advertising the commercial availability or quality of any property, goods, or services." Id. § 64.1200(f)(1). "Telemarketing" is defined as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, services, which is transmitted to any person." Id. § 64.1200(f)(12). The characterization of a call does not depend on the caller's perception as to whether the call constitutes a solicitation or advertisement, but the "purpose of the message" is what governs whether an autodialed call is a prohibited solicitation or advertisement. In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, 18 FCC 14014, 14097 (July 3, 2003).

In this case, plaintiff claims that he received four calls from an MLM operating on behalf of NPC between December 2013 and October 2014. Plaintiff did not answer the calls and messages were left on his cell phone, and the following message is representative of three of the messages:

> Stop what you're doing for the next 30 seconds and listen to this incredibly important message from Erica and her business partner, Johnny "Cash." If you want more money in your life today, and you're willing to invest only 7 short minutes, we will show you how you can simply and easily advertise a phone number that will give you direct and daily cash flow. It's so easy a fifth grader can do it, it's not MLM, there's no cold calling. I promise you that you will not have to bug your friends and family. To see how this works, just call 321-332-1516. Again, that's 321-33[6]-1516. You'll be really glad you did!

Dkt. # 49, at 6. The message does not mention NPC or its products. Plaintiff also received a fourth call about a marketing program:

> Would you like to receive 100 incoming calls each month from people with network marketing experience who want to know about your business? That's right. Receive 100 incoming calls from experienced network marketers who want to know more about your business. For more information, press "1" now, or dial 314-669-2629, that's 314-669-2629. Press "2" to be removed.

Id. at 7. This message also did not reference NPC or an MLM distributing NPC's products. However, plaintiff believes that Darick Patterson, Alan Turnquist, Alicia Croker/Turnquist, Steve Gewecke, Morningstar, and MyNyloxin were part of an MLM used an autodialing system to place the calls received by plaintiff. Id. at 7-8. Plaintiff alleges that Gewecke is the president of sales for MyNyloxin and that MyNyloxin sells a product called Nyloxin, and he claims that Nyloxin is an analgesic distributed by NPC. Id. at 8. He also alleges that Gewecke, Morningstar, MyNyloxin, and NPC sell unregistered securities in violation of federal law. Id. He claims that the unregistered security is called a "media unit," and he further alleges that NPC and Gewecke have violated the Securities Exchange Act by selling media units.

7

Plaintiff has not alleged that NPC directly called his cell phone in violation of the TCPA but, instead, he argues that an MLM operating on behalf of NPC placed calls to his cell phone without his express written consent. Dkt. # 105. He cites Pontrelli v. Monavie, Inc., 2014 WL 4105417 (D.N.J. Aug. 19, 2014), to support his argument that a company can be held liable under consumer protection laws for the actions of distributors under an agency theory. He also relies on § 1.01 of the Restatement (Third) of Agency, which provides:

> Agency is the fiduciary relationship that arises when one person (a "principal") manifests assent to another person (an "agent") that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.

RESTATEMENT (THIRD) OF AGENCY § 1.01 (2006). Plaintiff argues that the Tenth Circuit has cited § 1.01 with favor and has relied on the Restatement (Third) of Agency when deciding whether a principal can be held liable for the acts of another person or entity. See 1-800 Contacts, Inc. v. Lens.com, Inc., 722 F.3d 1229, 1250-52. (10th Cir. 2013).

The Court finds that plaintiff has failed to state a TCPA claim against NPC, because the amended complaint fails to allege that plaintiff received a call concerning the sale of any product distributed by NPC and it is not possible to infer that the alleged MLM could have been acting on behalf of NPC. Plaintiff has alleged that Gewecke was the president of MyNyloxin and that MyNyloxin partnered with certain individuals and entities to distribute Nyloxin on behalf of NPC. Plaintiff may have had a TCPA claim against NPC if he had received an autodialed solicitation concerning Nyloxin. However, plaintiff received calls about money-making schemes and marketing programs, and neither Nyloxin nor NPC was mentioned in the messages received by plaintiff. Plaintiff also argues that NPC and MyNyloxin sold unregistered securities called "media units" and the media units were used to fund infomercials. Dkt. # 49, at 8. However, the messages received

by plaintiff do not concern the sale or purchase of media units. Instead, three of the messages concern a scheme to make money by advertising a phone number and a fourth message relates to a marketing program. Dkt. # 49, at 6-8. Plaintiff's allegations concerning the existence of an MLM are irrelevant to the calls he allegedly received on his cell phone, and it is not necessary to reach plaintiff's strained theory of agency liability against NPC. The amended complaint does not include any allegations that would reasonably support an inference that the calls placed by unidentified persons to plaintiff's cell phone had anything to do with NPC or its products, and plaintiff's TCPA claim against NPC should be dismissed.

## C.

Plaintiff has asserted a tort claim against NPC on the theory that the autodialed calls constituted an invasion of privacy by intrusion upon his seclusion, and NPC asks the Court to dismiss this claim under Rule 12(b)(6). Plaintiff's response (Dkt. # 105) to defendant's motion to dismiss and his response (Dkt. # 101) to the motion for sanctions do not contain any arguments concerning the viability of his invasion of privacy claim.

Oklahoma courts recognize the tort of invasion of privacy by intrusion upon a person's seclusion, and this tort has two elements: "(a) a noncensensual intrusion (b) which was highly offensive to a reasonable person." Gilmore v. Enogex, Inc., 878 P.2d 360, 366 (Okla. 1994). This tort is not available for every intrusion upon a person's privacy, and the Oklahoma Supreme Court has noted that "[t]here is simply no room in the framework of our society for permitting one party to sue on the event of every intrusion into the psychic tranquility of an individual." Munley v. ISC Financial House, Inc., 584 P.2d 1336, 1338 (Okla. 1978). An intrusion occurs only when "an actor 'believes, or is substantially certain, that he lacks the necessary legal or personal permission to

9

commit the intrusive act.'" Dubbs v. Head Start, Inc., 336 F.3d 1194, 1221 (10th Cir. 2003). Oklahoma courts refer to Restatement (Second) of Torts § 652B in considering the scope of invasion of privacy torts, and the Restatement provides the following guidance as to the "highly offensive" element of the tort of invasion of privacy by intrusion upon a person's seclusion:

> There is likewise no liability unless the interference with the plaintiff's seclusion is a substantial one, of a kind that would be highly offensive to the ordinary reasonable man, as the result of conduct to which the reasonable man would strongly object. Thus there is no liability for knocking at plaintiff's door, or calling him to the telephone on one occasion or even two or three, to demand payment of a debt. It is only when the telephone calls are repeated with such persistence and frequency as to amount to a course of hounding the plaintiff, that becomes a substantial burden to his existence, that his privacy is invaded.

RESTATEMENT (SECOND) OF TORTS § 652B cmt. d (1977).

Plaintiff's invasion of privacy claim should be dismissed, because the Court has already determined that the allegations of the amended complaint do not support an inference that NPC had any responsibility for the calls received by plaintiff. Even if plaintiff viewed the calls as an invasion of privacy, he must sufficiently allege that the defendant actually committed an intrusive act. In addition, the Court finds that receiving four calls over nine month period would not constitute such a substantial intrusion into a person's privacy that a reasonable person would have found the conduct highly offensive.

### III.

NPC asks the Court to sanction plaintiff under Rule 11 for bringing frivolous claims against NPC, because plaintiff's claims against NPC are completely devoid of factual or legal support. Dkt. # 86. NPC asks the Court to award it attorney fees it incurred defending against plaintiff's claims.[4]

---

[4]   NPC has not attached the billing records of its attorneys to the motion for sanctions, and it is not clear what amount of attorney fees have been incurred by NPC.

Plaintiff responds that he "carefully selected NPC as a defendant after many hours of investigation" and he claims that he had a legitimate factual basis to believe that NPC was part of an MLM that was formed to sell NPC's products. Dkt. # 101.

Under Rule 11, an attorney or pro se litigant must sign every pleading, written motion, or paper filed with the Court, and by doing so the attorney or pro se litigant is representing that:

> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law;
>
> (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and
>
> (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

Fed. R. Civ. P. 11(b). The standard to determine whether an attorney should be sanctioned for filing a frivolous motion or document is "objective reasonableness--whether a reasonable attorney admitted to practice before the district court would file such a document." Adamson v. Bowen, 855 F.2d 668, 673 (10th Cir. 1988). This is a difficult standard to satisfy in a judicial system that permits zealous advocacy, because an "attorney can be rather aggressive and still be reasonable." Predator Int'l, Inc. v. Gamo Outdoor USA, Inc., 793 F.3d 1177, 1182 (10th Cir. 2015). The Court will take into account plaintiff's status as a pro se litigant, but a pro se litigant is required to follow the same

11

rules as other litigants and he is not immune from sanctions due to his pro se status.[5] Citibank, N.A. v. Williams, 2015 WL 4641610 (D. Colo. Aug. 5, 2015).

NPC argues that plaintiff should be sanctioned for violating Rule 11(b)(2) and (3), because his claims against NPC are wholly devoid of factual or legal support. In response, plaintiff has provided a "Statement of Investigative Facts" in which he explains how he attempted to locate the owner of certain telephone numbers who allegedly called his cell phone. Dkt. # 101, at 2. He claims that he researched the owners of three phone numbers, and he identified the owners as Alan Turnquist, Darrick Patterson, and Reba King. Id. at 3. The messages he received referenced "totalcashcontrol.com" and "yourtotalcashcontrol.com" and he claims that Gewecke was the owner of these now defunct websites. Id. at 3-4. Plaintiff learned that, on April 29, 2014, Gewecke had been appointed as the president of MyNyloxin, and plaintiff received one call from an unfamiliar number after that date. Id. at 4. He claims that MyNyloxin sells unregistered securities called "media units," and he alleges that NPC is liable for the conduct of its distributor, MyNyloxin, for the unlawful efforts to sell media units to him. Id. at 5-6.

Plaintiff has submitted evidence which he claims he relied upon to reach the conclusion that he had viable claims against NPC, and the Court has reviewed the evidence. In September 2012, NPC announced that it would be distributing Nyloxin through a network of distributors. Dkt. # 101-2, at 1. NPC later gave exclusive distribution rights for Nyloxin to MyNyloxin. Dkt. # 101-5. Plaintiff found a posting on the Internet from an unidentified person suggesting that MyNyloxin is a Ponzi scheme and the person submitting the post believed that the company running MyNyloxin

---

[5]   The Court notes that plaintiff was a law student when the case was filed and he may be now a licensed attorney, and his pleadings are not viewed as liberally as the ordinary pro se litigant.

was also responsible for other pyramid schemes, including Text Cash Network and True Cash Network. Dkt. # 101-8. On the MyNyloxin Blog on April 29, 2014, Gewecke posted a letter stating that he had been appointed the president of MyNyloxin, and he thanked the CEO of NPC and others for hiring him. Dkt. # 101-14. The letter does mention the "MLM industry," but the letter does not suggest that NPC was part of an MLM or what product would be sold by MyNyloxin. Id. Gewecke posted a second letter on June 12, 2014 describing the sale of Nyloxin and the "MLM division" as separate aspects of MyNyloxin's business. Dkt. # 101-18. Plaintiff has also attached an advertisement from the MyNyloxin Direct Response Media Division (MDRMD) specifically stating that the sale of media units is handled by the "advertising arm" of MyNyloxin, and there is no suggestion in the advertisement that NPC has any involvement with or makes any money from the sale of media units. Dkt. # 101-19.

The evidence submitted by plaintiff should also be viewed in the context of the messages he received on his cell phone. Plaintiff claims that he received the following messages on his cell phone:

> Stop what you're doing for the next 30 seconds and listen to this incredibly important message from Erica and her business partner, Johnny "Cash." If you want more money in your life today, and you're willing to invest only 7 short minutes, we will show you how you can simply and easily advertise a phone number that will give you direct and daily cash flow. It's so easy a fifth grader can do it, it's not MLM, there's no cold calling. I promise you that you will not have to bug your friends and family. To see how this works, just call 321-332-1516. Again, that's 321-33[6]-1516. You'll be really glad you did!
>
> . . .
>
> We're Erica and Steve, and we want to show you how to create daily cash flow. If you're willing to take 7 minutes of your time, I want to show you how you can advertise a phone number and create daily and direct cash flow every single day, up to $1,000 a day! You can visit us at yourtotalcashcontrol.com; again yourtotalcashcontrol.com for more details. We look forward to talking to you.

13

. . .

> Would you like to receive 100 incoming calls each month from people with network marketing experience who wants to know about your business? That's right. Receive 100 incoming calls from experienced network marketers who want to know more about your business. For more information, press "1" now, or dial 314-669-2629, that's 314-669-2629. Press "2" to be removed.

. . .

> Stop what you're doing and listen to this important message from Ericka and Paul and their business partner, "Johnny Cash." This is if you want more money in your life call us at 203-295-7551. Call back the number on your Caller ID. Could you use an extra $1,000 or $2,000 a week or more? Are you willing to take only 7 short minutes so we can show you how to advertise a phone number that will give you more money every day? Visit us online right now at totalcashcontrol.com to see how this works. It's so easy a fifth grader can do it. It's not MLM, there's no cold calling, I promise you won't have to bug your friends or family and there is no selling required. Call back the number on your Called ID, or visit us online at totalcashcontrol.com and you'll be glad you did!

Dkt. # 49, at 6-8. The calls do not mention NPC or Nyloxin, and the calls also do not mention MyNyloxin or media units.

The Court finds that plaintiff had no objective basis to believe that NPC was responsible in any way for the calls placed to his cell phone, and plaintiff should be sanctioned for bringing claims against NPC. No reasonable attorney would have brought a claim against NPC based on the information in plaintiff's possession, and plaintiff's claims against NPC are nothing more than an unsupported conspiracy theory based upon many layers of conjecture. The messages left on plaintiff's cell phone have no apparent connection to NPC, and there is no mention of any product sold by NPC in the messages. Even if plaintiff is correct that MyNyloxin operates an MLM, plaintiff has made no credible allegation that the MLM was responsible for the calls placed to his cell phone. The evidence provided by plaintiff does not establish any connection between the persons who allegedly called him and the MLM, and it is unclear that the alleged existence of an

MLM has any relevance to plaintiff's claims against NPC. The Court will refer this matter to the assigned magistrate judge to hold a hearing as to the appropriate sanction. NPC's motion does not include any attorney time or billing records and the Court cannot determine the amount of attorney fees and expenses incurred by NPC in defending against plaintiff's frivolous claims. However, this does not mean that an appropriate sanction is limited to a monetary sanction, and the magistrate judge should consider the full scope of permissible sanctions when making a recommendation to the Court.

**IV.**

Plaintiff asks the Court to reconsider its decision to grant CRST's motion for summary judgment as to his TCPA claim, because CRST failed to establish that plaintiff gave his express consent to receive autodialed calls on his cellular phone. Dkt. # 107. Defendant responds that the evidence established that plaintiff provided his cell number to CRST and that he consented to be called about employment opportunities with CRST. Dkt. # 108.

The Court treats plaintiff's motion to reconsider under Fed.R.Civ.P. 54(b), as the underlying order is not a final order or judgment. See Raytheon Constructors, Inc. v. Asarco Inc., 368 F.3d 1214, 1217 (10th Cir.2003). The Court may call into play the legal standards applicable to a Rule 59(e) motion to alter or amend judgment. See e.g., Official Committee of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand LLP, 322 F.3d 147, 167 (2d Cir. 2003). A motion to reconsider, like a motion to alter or amend judgment, should be granted only upon the following grounds: "(1) an intervening change in the controlling law, (2) new evidence previously unavailable, [or] (3) the need to correct clear error or prevent manifest injustice." Servants of the Paraclete v. Does, 204 F.3d 1005, 1012 (10th Cir. 2000); see Adams v. Reliance Standard Life Ins. Co., 225 F.3d

15

at 1186 n. 5 (10th Cir. 2000). The Court will exercise its discretion to review plaintiff's motion to reconsider under the standards applicable to Rule 59(e) motions.

Plaintiff challenges the Court's opinion and order (Dkt. # 100) and the Court will briefly review the parties' arguments and the Court's ruling on plaintiff's TCPA claim against CRST.[6] CRST filed a motion for summary judgment on the grounds that the calls received by plaintiff did not constitute "telemarketing" under the TCPA and that plaintiff gave prior express consent to receive calls from CRST. Dkt. # 42. Plaintiff responded that the "outcome of this case turns primarily on one question of law. It is whether **whether** (sic) CRST's prerecorded contacts were purely informational under 47 C.F.R. § 64.1200(a)(1), **or constituted unsolicited advertising or telemarketing under** 47 C.F.R. § 64.1200(a)(2) **and** 47 U.S.C. § 227(a)(4)." Dkt. # 43, at 11 (emphasis in original). Plaintiff further stated that his TCPA claim was governed by 47 C.F.R. § 64.1200(a)(2), as opposed to 47 C.F.R. § 64.1200(a)(1), and he argued that CRST needed to obtain express written consent to contact plaintiff using an autodialing system. Id. at 19. The Court found it unnecessary to reach the issue of plaintiff's consent to receive autodialed calls, because the messages left on plaintiff's cellular phone were not calls that were covered by the TCPA. The Court cited and quoted 47 U.S.C. § 227(b)(1)(B), which provides that it is unlawful "for any person within the United States . . . to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is . . . exempted by rule or order of the [FCC]." FCC regulations explain that calls that "introduce[] an advertisement or constitute[] telemarketing" may not be made using an

---

[6]  The Court will limit its analysis to plaintiff's TCPA claim, because plaintiff's motion to reconsider is focused only on this claim.

autodialing system without the express consent of the recipient of the call. 47 C.F.R. § 64.1200(a)(2). The Court found that the messages received by plaintiff were not "telemarketing" or "advertisements" and the TCPA was inapplicable, and the Court did not reach the issue of plaintiff's consent. Dkt. # 8-10. The Court granted CRST's motion for summary judgment.

Plaintiff now advances a new theory under which he alleges that CRST can be held liable under the TCPA. Instead of proceeding under § 64.1200(a)(2), plaintiff now argues that it is irrelevant under § 64.1200(a)(1) if the calls he received were not "telemarketing," because under this regulation CRST could not place any autodialed call to plaintiff without his "express consent." The Court declines to consider this argument, because plaintiff expressly disavowed that he was proceeding under § 64.1200(a)(1) and this is a classic example of a party attempting to change positions after having his previous arguments rejected. Plaintiff plainly represented the "dispositive issue" was whether the calls he received constituted prohibited "telemarketing," and this is only an issue if a TCPA plaintiff is relying on § 64.1200(a)(2). The Court considered the arguments raised by plaintiff and found that the calls he received from CRST were not "telemarketing." Even if he had asserted a claim under § 64.1200(a)(1), the evidence established that CRST does not purchase call lists from third parties, and the only way that CRST could have received plaintiff's phone number was if he provided the number to CRST or a recruiting service. Dkt. # 42-1, at 2. Plaintiff did not dispute that at one time he was looking for employment as a truck driver and that he voluntarily provided his contact information to CRST. For the purpose of § 64.1200(a)(1), a person is deemed to provide express consent to receive calls on his cell phone if he voluntarily provides his number to another person or entity. Wills v. Optimum Outcomes, Inc., 2014 WL 220707, *4 (D. Utah Jan. 21, 2014); Saunders v. NCO Fin. Sys., Inc., 910 F. Supp. 2d 464, 467 (E.D.N.Y. 2012).

Plaintiff could not prevail on his TCPA claim against CRST even if he were permitted to proceed under § 64.1200(a)(1), and the Court finds that plaintiff's motion to reconsider (Dkt. # 107) should be denied.

**IT IS THEREFORE ORDERED** that Defendant Nutra Pharma Corp.'s Motion for Sanctions Pursuant to Federal Rule Civil Procedure 11 (Dkt. # 86) is **granted**, and Defendant Nutra Pharma Corp.'s Motion to Dismiss and Brief in Support (Dkt. # 91) is **granted**.

**IT IS FURTHER ORDERED** that Plaintiff's Motion to Reconsider Summary Judgment (Dkt. # 107) is **denied**.

**IT IS FURTHER ORDERED** that NPC is directed to file an amended motion for sanctions with all attorney time and billing records no later than **January 19, 2015**. The amended motion for sanctions will be referred to Magistrate Judge T. Lane Wilson for a hearing.

**DATED** this 4th day of January, 2016.

CLAIRE V. EAGAN
UNITED STATES DISTRICT JUDGE